**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ISAAC KOLONZIAA, et al.,<br>        Plaintiffs, | No. 3:24-cv-230 (SRU) |
| v. | |
| ALLIED COMMUNITY RESOURCES,<br>INC., et al.,<br>        Defendants. | |

<u>**RULING ON MOTION FOR SUMMARY JUDGMENT**</u>

Connecticut's Medicaid Waiver Program provides at-home assistance for elderly and infirm people. Live-in caregivers of the Medicaid waiver participants have sued a number of entities for alleged minimum and overtime wage violations. Two defendants, Allied Community Resources, Inc. and Allied Community Services, Inc. move for summary judgment on the basis that they were not the live-in caregivers' employers. For the following reasons, I **grant** the motion for summary judgment, **doc. no. 20**.

## I.    Background

### A.    Factual Allegations

Isaac Kolonziaa, Michele May-Javeed, and the putative class of plaintiffs they hope to represent bring an action for alleged violations of the Fair Labor Standards Act ("FLSA") and the Connecticut Minimum Wage Act ("CMWA"). *See generally* Doc. No. 1. The plaintiffs worked as personal care assistants ("PCAs") within the Connecticut Department of Social Services's ("DSS") Medicaid Waiver program. *See* Def.'s L. R. 56(a)1 Stmt., Doc. No. 34 ¶¶ 4, 25. The Medicaid Waiver Program funds PCAs so that qualified individuals may receive at-

home assistance for daily activities. *Id.* ¶ 3. I refer to the individuals receiving at-home care as "waiver participants." *See id.* ¶ 7.

The PCAs received a flat rate for a day of work. Pl.'s L. R. 56(a)2 Stmt., Doc. No. 47-10 ¶ 48. DSS alone established the PCAs' rate of pay. *See id.* ¶ 49. The plaintiffs allege that their hourly wage, accounting for meal periods and interrupted sleep, fell below minimum and overtime wage requirements. Compl., Doc. No. 1 ¶¶ 10-13.

The plaintiffs sue DSS and two other entities. Defendant Allied Community Resources, Inc. ("Allied Resources") contracted with DSS to perform certain functions for the Medicaid Waiver program. Def.'s L. R. 56(a)1 Stmt., Doc. No. 34 ¶ 1. Defendant Allied Community Services ("Allied Services") wholly owns Allied Resources. *See id.* ¶ 77. Allied Services manages residential programs for disabled persons. Doc. No. 47-8 at 3-4. Allied Services does not provide at-home care. *See id.* Allied Services had no involvement with the plaintiffs besides the mere fact that it is the parent company of Allied Resources. *See* Pl.'s L. R. 56(a)2 Stmt., Doc. No. 47-10 ¶ 78.[1]

DSS created a "Service Plan" and allocated a budget for each waiver participant dependent on need and available Medicaid funds. Pl.'s L. R. 56(a)2 Stmt., Doc. No. 47-10 ¶ 14. The Allied defendants did not participate in forming the Service Plan or budget. *Id.* ¶¶ 15, 49. Allied Resources was contractually obligated to train the waiver participants, to list prospective PCAs on a "provider directory," and to conduct four job seeker events per year. Doc. No. 37 at 74, 76-77, 86. DSS sent Medicaid funds to Allied Resources, who in turn disbursed the funds to the plaintiffs in the form of wages. *See* Def.'s L. R. 56(a)1 Stmt., Doc. No. 34 ¶¶ 5, 50, 82. When Allied Resources disbursed the plaintiffs' wages, it was contractually obligated to follow

---

[1] The plaintiffs dispute Allied Services's claim that it had no interaction with them but present no material evidence to the contrary. *See id.*

DSS's instructions. *Id.* ¶ 50.[2]  Allied Resources additionally ran background checks on PCAs if a waiver participant requested one.  Doc. No. 33 ¶¶ 14-15; Doc. No. 37 at 84.

Isaac Kolonziaa was a live-in caregiver for a waiver participant.  *See generally* Doc. No. 47-3.  Kolonziaa originally worked for another provider agency.  *Id.* at 3.  When Allied Resources "took over" Kolonziaa's waiver participant as a "client," Allied sent Kolonziaa a new hire application.  *Id.*  Kolonziaa submitted the application and sent Allied other hiring materials. *Id.* at 3-4.  He also signed a "Provider Agreement" bearing Allied Resources's logo at the top of the document.  *See id.* at 4; Doc. No. 23-2 at 2, 4.  At some point, Kolonziaa called an Allied Resources representative for assistance when his waiver participant was interrupting his sleep. Doc. No. 47-3 at 5.  Allied Resources temporarily assigned another caregiver to assist Kolonziaa for one evening.  *Id.*

Michele May-Javeed was a live-in caregiver for her brother, a waiver participant.  Doc. No. 47-4 at 3.  May-Javeed also held power of attorney for her brother.  Doc. No. 33 ¶ 37; *see also* Doc. No. 23 ¶ 37.  May-Javeed signed a "packed of documents" from Allied Resources. Doc. No. 47-4 at 3.  Allied Resources explained certain tasks to May-Javeed, such as "how to complete the timesheet" and "safety protection[s]."  *Id.*  When May-Javeed experienced sleep interruptions, a representative from Allied Resources directed her to training videos on Allied's website.  *Id.* at 3-4.

B.  <u>Procedural History</u>

Allied first moved for summary judgment and moved to stay discovery on May 1, 2024. Doc. No. 20.  I held a telephonic Rule 16 conference on May 20, 2024.  Doc. No. 35.  During

---

[2] The plaintiffs dispute Allied Resources's claim that "Allied disbursed the money to pay Plaintiffs pursuant to DSS instruction," but present no material evidence to the contrary.  *See* Pl.'s L. R. 56(a)2 Stmt., Doc. No. 47-10 ¶ 50.

that conference, I granted in part the Allied defendants' motion to stay discovery and allowed limited discovery to proceed "on the issue of whether the Allied defendants are the plaintiffs' employer[] . . . so that the plaintiffs may meaningfully respond to the Allied defendants' motion for summary judgment." *Id.* I granted DSS's motion to stay discovery in full. *Id.*

DSS promptly filed a motion to dismiss for lack of subject matter jurisdiction, primarily on the basis that the Eleventh Amendment immunized them from suit. *See generally* Doc. No. 36. On June 21, 2024, the Allied defendants moved to dismiss. Doc. No. 40. The Allied defendants argued that they too were immunized by the Eleventh Amendment as arms of the state and that the plaintiffs had failed to plausibly allege that they were employers within the meaning of the FLSA and the CMWA. *See generally id.* After discovery, the plaintiffs filed their opposition to the motion for summary judgment. *See* Doc. No. 47.

On March 20, 2025, I held oral argument on the Allied defendants' motion for summary judgment, motion to dismiss, and on DSS's motion to dismiss. Doc. No. 51. I granted DSS's motion to dismiss after determining that the agency was entitled to sovereign immunity. *See id.* I denied the Allied defendants' Rule 12(b)(1) motion to dismiss on sovereign immunity grounds after determining that they were not arms of the state entitled to sovereign immunity. *See id.* I denied the Allied defendants' Rule 12(b)(6) motion in light of their pending motion for summary judgment, which I took under advisement. *See id.*

## II.    Standard of Review

### A.    Rule 56 Motion for Summary Judgment

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff

must present affirmative evidence in order to defeat a properly supported motion for summary

judgment).

When ruling on a summary judgment motion, the court must construe the facts of record

in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all

reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d

Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the

nonmoving party"). When a motion for summary judgment is properly supported by

documentary and testimonial evidence, however, the nonmoving party may not rest upon the

mere allegations or denials of the pleadings, but must present sufficient probative evidence to

establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986);

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is

summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also*

*Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving

party submits evidence that is "merely colorable," or is not "significantly probative," summary

judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not
> defeat an otherwise properly supported motion for summary judgment; the
> requirement is that there be no genuine issue of material fact. As to materiality,
> the substantive law will identify which facts are material. Only disputes over facts
> that might affect the outcome of the suit under the governing law will properly
> preclude the entry of summary judgment. Factual disputes that are irrelevant or
> unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary judgment may enter.  *Celotex*, 477 U.S. at 323.

## III.    Discussion

Allied Resources argues, among other things, that it was not the plaintiffs' employer under the FLSA or the CMWA.  In its view, the waiver participants were the plaintiffs' employer.[3]  Allied Services similarly argues that it could not have been the plaintiffs' employer because it was merely Allied Resource's parent company and had no interaction with, or control over, the plaintiffs.  For the reasons that follow, no reasonable jury could find that Allied Resources or Allied Services was the plaintiffs' employer under the FLSA or the CMWA.

---

[3] State law endorses Allied Resources's perspective.  "'Personal care attendants' means persons employed by a consumer or surrogate to provide personal care assistance to a consumer."  Conn. Gen. Stat. § 17b-706(3).

A.  <u>Employer Status under the Fair Labor Standards Act</u>

An "employer" under the FLSA "includes any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  An "employee" is "any individual employed by an employer."  *Id.* § 203(e)(1).  The Second Circuit "treat[s] employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances.  In assessing the 'economic reality' of a particular employment situation," the Second Circuit employs the *Carter* factors:  "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)) (cleaned up).  In the "totality of the circumstances" framework, "any relevant evidence may be considered."  *Id.* at 143 (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)).

1.  *Power to Hire and Fire*

The record indicates that Allied[4] did not have the power to hire or fire the plaintiffs.  Allied's CEO avers that "Allied did not interview the Plaintiffs. Allied had no interaction with the Plaintiffs, . . . until after they applied to the Waiver Participants to be hired. . . . Allied did not hire the Plaintiffs, nor did Allied participate in hiring decisions regarding Plaintiffs; they were hired by the Waiver Participants."  Doc. No. 33 ¶¶ 23-24.

In response, Kolonziaa states that he was neither interviewed nor hired by the waiver participant whom he assisted.  Doc. No. 47-3 at 3.  He asserts that the previous provider agency

---

[4] In Sections A and B, I refer to Allied Resources as "Allied" unless otherwise specified.

interviewed and hired him before Allied took over the Medicaid waiver participant contract. *Id.*
Kolonziaa does not, however, assert that Allied interviewed him. *See id.* at 3-4. Allied sent
Kolonziaa a "New Hire Application Packet" bearing Allied's name at the top of the application.
*Id.* at 3. Allied processed Kolonziaa's hiring materials. *Id.* at 3-4. May-Javeed similarly claims
that she submitted hiring materials to Allied, but does not claim that Allied interviewed her. *See*
Doc. No. 47-4 at 3-4, 6.

The mere fact that the new hire applications bore Allied's logo, and that Allied performed
the ministerial task of gathering and processing the plaintiffs' new hire materials, is insufficient
to show that Allied made hiring decisions. In fact, Allied's CEO declares that Allied had no
interaction with the plaintiffs until after they "applied" to be hired by their respective waiver
participants. Doc. No. 33 ¶¶ 23, 25. The plaintiffs present no material evidence to the contrary.
*See* Pl.'s L. R. 56(a)2 Stmt., Doc. No. 47-10 ¶ 44.

Allied's other contractual obligations included maintaining a provider directory of
prospective PCAs. *See* Doc. No. 37 at 74. "Registered Providers" could be removed from the
provider directory upon request of the provider or DSS. *Id.* at 86. The contract between DSS
and Allied also required Allied to "conduct a minimum of four job seeker events as approved by
the department per year to inform prospective individual Providers about the Provider
Directory . . . and employment opportunities for Individual Providers of HCBS." *Id.* Allied ran
background checks of PCAs upon a waiver participant's request and informed the waiver
participant of the background check's results. Doc. No. 37 at 84; Doc. No. 33 ¶¶ 14-15.

The plaintiffs cite a paragraph of the Provider Agreement stating that "[i]f, as a result of
the criminal background check, DSS or the Fiscal Agent determines that I am not suited to be a
provider in CMAP, I may not be listed on the Fiscal Agent's provider directory and may not be

permitted to obtain payment for services provided to CMAP clients." Doc. No. 47-5 ¶ 24.

Relying on that clause, the plaintiffs claim that Allied could unilaterally determine if a

prospective PCA was "suited to be a provider," and thus had the power to hire the PCAs. Doc.

No. 47 at 12-13. Allied's tasks of conducting background checks and maintaining a provider

directory do not equate to Allied's ability to hire. Under the plaintiffs' logic, a job search agency

that keeps a database of eligible job-seeking individuals would have "hired" those job-seeking

individuals.

Allied similarly lacked authority to fire a PCA. The contract between Allied and DSS did

not give Allied any authority to fire a PCA, "and Allied did not in fact do so." Doc. No. 33 ¶ 49;

*see generally* Doc. No. 37 at 62-125. The plaintiffs respond by invoking the Provider

Agreement, which "may be terminated . . . by DSS or its Fiscal Agent"—Allied—"upon 30 days

written notice," or without notice "if the provider fails to comply with any of the provisions of

this Agreement . . . or if a participant's safety or health is or may be at risk, as determined by

DSS." Doc. No. 47-5 at 6 ¶ 23.

The Provider Agreement is insufficient evidence of Allied's ability to hire and fire. The

Provider Agreement was created by DSS. Doc. No. 33 ¶ 20. Allied neither signed the Provider

Agreement nor participated in drafting the agreement. *Id.* ¶¶ 20-21. Allied's power to hire and

fire the plaintiffs cannot flow from a contract to which Allied was not a party. The ability to hire

and fire must instead arise from Allied's contract with DSS.

The hiring and firing factor therefore tips against FSLA employer status.

2. *Control*

Allied substantially lacked control over the plaintiffs' employment. The Provider

Agreement provides that the PCAs were obligated to comply with DSS's requirements, not

Allied's requirements. "I will comply with all requirements established by DSS for the type of service I provide to CMAP participants, including, but not limited to, having and maintaining credentials and participating in mandatory training." Doc. No. 47-5 ¶ 10. Allied was required to seek DSS's written approval before "paying any line item" that exceeded a participant's budget. Doc. No. 37 at 76.

Allied only trained the waiver participants, not the PCAs. Doc. No. 33 ¶¶ 18, 34, 37. One plaintiff—May-Javeed—is an exception because she was both a waiver participant's power of attorney and a PCA. Doc. No. 33 ¶ 37; *see also* Doc. No. 37 at 76-77. Allied called May-Javeed after she signed her employment paperwork to explain to her "how to complete the timesheet" and "safety protection[s]." Doc. No. 47-4 at 3. When May-Javeed reported sleep interruptions, Allied directed her to training videos on its website. *Id.* at 3-4. But neither Kolonziaa nor any other plaintiff received similar training from Allied. May-Javeed was more heavily trained than the other plaintiffs because she was both a waiver participant and a PCA.

Regarding supervision, Kolonziaa makes a conclusory statement that Allied supervised him. *See* Doc. No. 47-3 at 4. There is no evidence that Allied supervised Kolonziaa or any other plaintiff. Allied did not review Kolonziaa's work or direct his daily tasks. Allied assigned another caregiver to help Kolonziaa for one evening, doc. no. 47-3 at 5, but that assignment does not amount to supervision.

I next turn to the *Zheng* factors, another measuring tool for an alleged employer's control over employees.

a. Control Under the *Zheng* Factors

An entity can be considered an employer under the FLSA, despite having no formal control over its alleged employees, if it functionally controls the employees as a joint employer.

10

*Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 143 (2d Cir. 2008) (citing *Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003)).  The *Zheng* factors measure a joint employer's de facto control.  *Barfield*, 537 F.3d at 146 ("*Zheng* contemplates arrangements under which the totality of circumstances demonstrate that workers formally employed by one entity operatively function as the joint employees of another entity . . . .").  Courts evaluate:  (1) whether the plaintiffs used the entity's premises and equipment; (2) whether the entity's business could or did shift as a unit from one putative joint employer to another; (3) the extent to which the plaintiffs performed an integral job for the entity's process of production; (4) "whether responsibility under the contracts could pass from one subcontractor to another without material changes;" (5) the degree to which the entity supervised the plaintiffs; and (6) whether the plaintiffs worked predominantly for that entity.  *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003).  I take each factor in turn.

First, the plaintiffs used Allied's computer equipment to record their hours.  But use of Allied's equipment is only relevant if it "support[s] the inference that a putative joint employer has functional control over the plaintiffs' work."  *Id.*  Here, that inference is unsupported.

Second, "a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client."  *Id.*  At oral argument, Allied stated that it contracted with entities other than DSS during the relevant period.  Allied easily shifted from working as a fiscal intermediary for DSS to working as a fiscal intermediary for other entities.  The factor thus weighs in Allied's favor.

The third factor also weighs in Allied's favor.  "[I]nsofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge

to avoid complying with labor laws." *Id.* at 73. Fiscal intermediaries like Allied are standard across the American economy.

Fourth, Allied's contractual responsibilities with DSS could easily be passed to a different fiscal intermediary. Therefore, "the responsibility under the . . . contracts without material changes" could be "passed from one [subcontractor] to another." *Id.* at 74 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). Allied only held authority over the plaintiffs to the extent that DSS gave them that authority. The fourth factor weighs in Allied's favor.

The fifth and sixth factors are in accord. Allied did not supervise the plaintiffs. Although the plaintiffs claim that some of them worked exclusively for the waiver participants, the plaintiffs did not work predominantly *for Allied*.

The *Zheng* factors overall demonstrate that Allied lacked functional control over the plaintiffs. Allied appears to have only "supervised" the PCAs to the extent that reviewing timesheets to ascertain if they were filled out and signed by the waiver participant could reasonably equate to supervision. Instead, the record indicates that the waiver participants supervised the PCAs. The control factor therefore tips against FLSA employer status.

3. *Determined the Rate and Method of Payment*

Fiscal intermediaries have been "employers" under the FLSA when they set wages and control compensation. *E.g.*, *Hardgers-Powell v. Angels in Your Home LLC*, 330 F.R.D. 89, 111-12 (W.D.N.Y. 2019) (holding that a fiscal intermediary was an employer when it set the rate of pay, audited timesheets, and monitored participants).

Allied was required to disburse payments to the plaintiffs biweekly within 30 days of receiving an invoice. Doc. No. 23-1 at 9. Allied paid the PCAs, then submitted claims to DSS

12

for reimbursement. *Id.* The waiver participants reviewed the PCAs' timesheets for accuracy. Doc. No. 33 ¶ 31. Allied only checked the timesheets to ensure that they "were fully filled out" and signed, then "disbursed payment in accordance with the instructions of the DSS[.]" *Id.* ¶¶ 31-32. The Provider Agreement notes that DSS "pa[id]" the plaintiffs and that Allied was a mere intermediary: "The rate DSS pays for my services . . . through the Fiscal Agent, is payment in full." Doc. No. 47-5 ¶ 9.

The rate and method of payment factor therefore tips against FSLA employer status.

### 4. *Employment Records*

Allied undisputedly obtained and retained the plaintiffs' employment records. Allied was contractually obligated to review invoices and timesheets, receive and process fund advances, disburse payments, and "[c]onduct an annual internal audit on pre- and post- employment requirements . . . and submit the findings to the Department." *See* Doc. No. 37 at 74-76. Specifically regarding payroll, Allied received, disbursed and tracked Medicaid funds, processed participant enrollment paperwork, "spot check[ed] timesheets for fraud protection," and filed taxes. *Id.*; Doc. No. 33 ¶¶ 26, 28, 30, 32.

May-Javeed declares that "[a]ll the hire documents which I signed are kept by Allied. Allied also has my paystubs." Doc. No. 47-4 at 4. Kolonziaa similarly declares that Allied retained his "new hire application packet . . . w-2, worker's compensation insurance, health benefits, [and] unemployment compensation." Doc. No. 47-3 at 8. None of those documents transforms Allied from a mere fiscal intermediary into an employer. Allied only obtained and retained employment records relevant to conducting payroll.[5] Its retained documents do not

---

[5] There is no evidence that Allied performed or retained performance evaluations or other non-administrative documents.

support an inference of control over the plaintiffs.  The employment record factor thus weighs against FSLA employer status.

*      *      *

The *Clyde* and *Zheng* factors indicate that Allied was not the plaintiffs' employer.  There is little evidence "that would permit a rational jury to find that" the plaintiffs' "working relationship with [the defendants] exceeded its limited payroll processing function."  *See Clyde v. My Buddy the Plumber Heating & Air, LLC*, 2021 WL 778532, at *3 (D. Utah Mar. 1, 2021).  I therefore hold that Allied Resources was not the plaintiffs' employer and grant its motion for summary judgment on Count One, the FLSA claim.

### B. Employer Status under the Connecticut Minimum Wage Act

Allied Resources similarly moves for summary judgment on the basis that it is not the plaintiffs' employer under the CMWA.  The CMWA "provide[s] wage and overtime guarantees similar to the FLSA."  *Lin v. W & D Assocs. LLC*, 2015 WL 7428528, at *7 (D. Conn. Nov. 20, 2015) (quoting *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 263 n.2 (D. Conn. 2002)).  An "employer" within the meaning of the CMWA's minimum and overtime wage provisions includes "any . . . corporation . . . acting directly as, or on behalf of, or in the interest of an employer in relation to employees[.]"  Conn. Gen. Stat. § 31-58(d).

"[T]he Connecticut Supreme Court has declined to adopt the 'economic reality' test for purposes of evaluating joint-employer status under the CMWA. . . . Instead, Connecticut courts consider factors such as whether the alleged employer set the hours of employment, paid wages, exercised control over day-to-day responsibilities, or ran other daily operations."  *Flemming v. REM Connecticut Cmty. Servs. Inc.*, 2012 WL 6681862, at *2 (D. Conn. Dec. 21, 2012) (citing *Butler v. Hartford Technical Inst.*, 243 Conn. 454, 462 n.8, 464-65 (1997) and *Petronella ex rel.*

14

*Maiorano v. Venture Partners, Ltd.*, 60 Conn. App. 205, 211-12 (2000)).  However, this District has also used the FLSA's economic reality test to determine if a defendant is a joint employer under the CMWA.  *E.g.*, *Dixon v. Zabka*, 2014 WL 6084351, at *18-*19 (D. Conn. Nov. 13, 2014) (reasoning that "it is more appropriate to apply the 'economic reality' test . . . instead of only the *Flemming* factors" because of the degree to which "the definition of 'employer' in Conn. Gen. Stat. § 31-58 for purposes of minimum wage claims . . . more closely tracks the FLSA definition.") (cleaned up).  For the reasons articulated in *Dixon*, I employ both the FLSA economic reality factors and the *Flemming* factors to ascertain if Allied is an employer under the CMWA.

As previously discussed, Allied is not the plaintiffs' employer under the economic reality test.  The *Flemming* factors compel the same conclusion.  DSS, not Allied, set the plaintiffs' per diem pay rate.  Doc. No. 47-5 ¶ 9; Doc. No. 33 ¶ 27.  Allied followed DSS's instructions when it disbursed the plaintiffs' wages.  Doc. No. 33 ¶¶ 31-32.  Allied only spot checked the plaintiffs' timesheets for fraud and compliance with a waiver participants' Service Plan; it did not review the timesheets for accuracy.  *See id.* ¶¶ 28, 30-31.  Allied did not exercise control over the plaintiffs' daily responsibilities.  *See supra* Section III.A.2.  Although Allied physically paid the plaintiffs' wages as DSS's intermediary, both DSS and the waiver participants exercised a much greater degree of control and influence over the plaintiffs' hours and wages than Allied.  *Contra Modise v. CareOne Health Servs.*, LLC, 638 F. Supp. 3d 159, 186-87 (D. Conn. 2022) (denying an alleged employer's summary judgment motion when the employer had the "ultimate authority and control over the specific employment terms that allegedly caused Plaintiffs' CMWA rights to be violated" and "d[id] not argue that control over Plaintiffs' wages was shared with the individual clients or anyone else.").

No reasonable jury could find that Allied was the plaintiffs' employer under the CMWA. I therefore grant Allied Resource's motion for summary judgment on Count Two, the CMWA claim.

   C.   Allied Services's Employer Status

Allied Services wholly owns Allied Resources.  *See* Def.'s L. R. 56(a)1 Stmt., Doc. No. 34 ¶ 77.  Allied Services argues that it cannot be liable under the FLSA because it "had no involvement with anything alleged in the Complaint other than by virtue of its status as Allied's parent corporation."  Doc. No. 21 at 11.  The plaintiffs respond by arguing that they "interacted with PCAs who may have worked in residential facilities operated by Allied Community Services."  Pl.'s L. R. 56(a)2 Stmt., Doc. No. 47-10 ¶ 78.  That hypothetical interaction with a PCA who may have worked for Allied Services is a far cry from being *employed by* Allied Services.  More importantly, the plaintiffs have not shown that Allied Resources—the entity that actually interacted with the plaintiffs—was their employer.  I therefore grant Allied Services's summary judgment motion on, Counts Three and Four, the FLSA and CMWA claims.

**IV.   Conclusion**

For the foregoing reasons, I **grant** Allied Resources and Allied Services's motion for summary judgment, **doc. no. 20**, because there is insufficient evidence from which a reasonable jury could find that they were the plaintiffs' employers.  I direct the Clerk to enter judgment in favor of Allied Resources and Allied Services against the plaintiffs.

So ordered.

Dated at Bridgeport, Connecticut, this 31st day of March 2025.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
